**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5130**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

In re U.S. DOGE SERVICE, et al.,

Petitioners.

———————————

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia

———————————

**PETITION FOR A WRIT OF MANDAMUS**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney
  General*

MARK R. FREEMAN
THOMAS PULHAM
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff
  Civil Division, Room 7323
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-0213*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY ................................................................. 1

STATEMENT ................................................................................................... 5

ARGUMENT ................................................................................................... 13

Mandamus is warranted to prevent discovery against an advisory body
    within the Office of the President ............................................................. 13

    A.    The Supreme Court has made clear that discovery against
        the Office of the President is reserved for exceptional
        circumstances and must be a last resort. ....................................... 13

    B.    The discovery order here violates separation-of-powers
        principles under *Cheney* and FOIA precedent ............................. 16

        1.    The requested discovery is not necessary to
            determine FOIA's applicability .............................................. 20

        2.    To the extent any discovery is proper, it must be
            limited to assessing USDS's formal authority. ................... 29

        3.    The discovery order's breadth imposes significant
            burdens on the Executive Branch. ....................................... 34

CONCLUSION .................................................................................................. 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Armstrong v. Executive Office of the President,*
  90 F.3d 553 (D.C. Cir. 1996)................................................................17, 21, 23

*Association of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993)........................................................................28

*Cheney v. U.S. Dist. Court for D.C.,*
  542 U.S. 367 (2004)........................................................1, 2, 3, 4, 13, 14, 15, 16,
                                                                    20, 22, 24, 30, 31, 35, 36, 38

*Cheney, In re,*
  406 F.3d 723 (D.C. Cir. 2005)........................................................................13

*Cheney, In re,*
  544 F.3d 311 (D.C. Cir. 2008)........................................................................34

*City of Arlington v. FCC,*
  569 U.S. 290 (2013)........................................................................................23

*Clinton v. Jones,*
  520 U.S. 681 (1997)........................................................................................14

*Clinton, In re,*
  973 F.3d 106 (D.C. Cir. 2020)........................................................................33

*CREW v. Office of Admin.,*
  566 F.3d 219 (D.C. Cir. 2009)........................................................................23

*Judicial Watch v. U.S. Secret Serv.,*
  726 F.3d 208 (D.C. Cir. 2013)...........................................................3, 21, 22, 24

*Kissinger v. Reporters Comm. for Freedom of the Press*
  445 U.S. 136 (1980)........................................................................................21

*Meyer v. Bush,*
981 F.2d 1288 (D.C. Cir. 1993) .................................................. 3, 22, 28

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) .................................................................. 14, 39

*Pacific Legal Found. v. Council on Envtl. Quality,*
636 F.2d 1259 (D.C. Cir. 1980) ................................................. 22-23

*Rushforth v. Council of Econ. Advisers,*
762 F.2d 1038 (D.C. Cir. 1985) ....................................................... 22

*Sierra Club v. Andrus,*
581 F.2d 895 (D.C. Cir. 1978), *rev'd on other grounds,*
442 U.S. 347 (1979) ......................................................................... 26

*Simplex Time Recorder Co. v. Secretary of Labor,*
766 F.2d 575 (D.C. Cir. 1985) .................................................. 18, 33

*Soucie v. David,*
448 F.2d 1067 (D.C. Cir. 1971) ................................................ 21, 23

*Sweetland v. Walters,*
60 F.3d 852 (D.C. Cir. 1995) ......................................................... 22

*United States v. Nixon,*
418 U.S. 683, 692 (1974) ......................................................... 14, 38

*U.S. Dep't of Educ., In re,*
25 F.4th 692 (9th Cir. 2022) ......................................................... 33

**Statutes:**

All Writs Act,
28 U.S.C. § 1651 ......................................................................... 1, 13

Freedom of Information Act (FOIA),
    5 U.S.C. § 552(f) ...........................................................21


**Regulatory Materials:**

Exec. Order No. 14,158,
    90 Fed. Reg. 8441 (Jan. 29, 2025) ..............................5-6, 6, 17, 25, 26

Exec. Order No. 14,170,
    90 Fed. Reg. 8621 (Jan. 30, 2025) ............................................6, 25, 35

Exec. Order No. 14,210,
    90 Fed. Reg. 9669 (Feb. 14, 2025) ...........................7, 18, 18-19, 25, 27, 31, 33

Exec. Order No. 14,218,
    90 Fed. Reg. 10,581 (Feb. 25, 2025) ........................................7, 25, 35

Exec. Order No. 14,219,
    90 Fed. Reg. 10,583 (Feb. 25, 2025) ......................................................7

Exec. Order No. 14,222,
    90 Fed. Reg. 11,095 (Mar. 3, 2025) ...........................................25-26


**Rules:**

Fed. R. Civ. P. 30(b)(6) ...........................................................18

Fed. R. Civ. P. 56(d) ...............................................................9


**Other Authorities:**

Order, *In re Musk*, No. 25-5072 (D.C. Cir. Mar. 26, 2025) ...............................5

The White House, *Hiring Freeze* (Jan. 20, 2025),
    https://perma.cc/WK5Y-DE7Z.................................................6, 25

# GLOSSARY

FOIA .............................................................. Freedom of Information Act

OMB ............................................................ Office of Management and Budget

USDS........................................................................ U.S. DOGE Service

## INTRODUCTION AND SUMMARY

Under the All Writs Act, 28 U.S.C. § 1651, the government respectfully asks this Court to issue a writ of mandamus quashing the district court's April 15, 2025, discovery order. The district court ordered extraordinary and wide-ranging discovery into the U.S. DOGE Service (USDS), an advisory body within the Executive Office of the President (Office of the President) that reports directly to the President's Chief of Staff. Among other things, the court ordered the deposition of USDS's head and the disclosure of all specific recommendations that USDS has provided to agencies on a host of topics. That highly invasive order—purportedly to address whether the Freedom of Information Act (FOIA) applies to USDS in the first place—cannot be reconciled with the Supreme Court's decision in *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 385 (2004), and warrants mandamus relief. In light of the burdens on the Executive Branch and the short, seven-day time frame for initial responses and objections to discovery, the government also asks in an accompanying stay motion that this Court issue an immediate administrative stay of the discovery order or rule on the government's stay motion by April 21, 2025, the day before the district court's deadline.

The discovery order here raises grave separation-of-powers concerns, authorizing dragnet requests for information regarding the activities of an advisory body within the Office of the President. The order includes not just broadly phrased requests for information regarding every employee, a host of internal documents, and the deposition of the USDS head, but also explicitly requires USDS to provide detailed information regarding the substance of its advice to agencies—the heartland of the deliberative process within a White House advisory entity.

That sweeping discovery order flatly contravenes the Supreme Court's instructions regarding the "high respect that is owed to the office of the Chief Executive" in the conduct of litigation, and it burdens "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. Addressing a similar discovery order, the Supreme Court made clear that discovery against the Office of the President must be reserved for the most exceptional of circumstances. *See Id.* at 385-92. It is permissible, if at all, only when strictly necessary; only after all other avenues for resolving the plaintiffs' claims have been explored; and only when drawn as narrowly as possible. *Id.* The Court also expressly rejected the view that the threatened

intrusion on the autonomy and confidentiality interests of the Office of the President can be addressed through the assertion of executive privilege on a document-by-document basis. *See id.* at 389-90. The order here violated each of those principles.

Making matters worse, the district court ordered broadly phrased discovery in service of determining whether USDS is subject to FOIA—a narrow threshold inquiry that is itself designed to avoid separation-of-powers concerns. To avoid the difficult constitutional questions that would arise from forcing the President's advisors to disclose their operations to public inspection, both Congress and this Court have made clear that an advisory body within the Office of the President is subject to FOIA's disclosure requirements only if the body goes "beyond advising" and is formally vested with "substantial independent authority." *Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993) (emphasis omitted); *see Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 227 (D.C. Cir. 2013).

The district court fundamentally erred in using that inquiry to subject an advisory entity within the Office of the President to sweeping discovery. Indeed, the district court's order requires disclosure of some of the same information that plaintiff seeks in its FOIA requests and more—including

3

the in-person deposition of USDS's head—directly contrary to the Supreme Court's admonition against discovery of information to which a party would "be entitled in the event they prevail on the merits." *Cheney*, 542 U.S. at 388.

The district court went even further astray in casting the question of FOIA's application as depending on the degree of "USDS's influence over other federal agencies." Op. 4, 10, 12. As this Court has recognized, countless advisors within the Office of the President clearly wield influence, often great influence, over federal agencies. But those advisors' proximity to the President, and their consequent ability to credibly relay the President's wishes, does not convert those advisors into "agencies" under FOIA. The question whether USDS is an "agency" turns on its formal authority as delineated in the publicly available executive orders establishing USDS. No discovery is required to answer that question.

But even if plaintiffs could identify some potentially relevant material (which they cannot), any discovery must be circumscribed by both the separation-of-powers concerns identified above and the inherently limited nature of an inquiry into actual, formal authorities. If allegations about an advisory body's influence were sufficient to justify the kind of sweeping discovery order here, the mere filing of a FOIA complaint could become a

means of forcing advisory bodies in the Office of the President—the Chief of Staff's Office, the Domestic Policy Council, and more—to disclose their internal operations, contrary to the expressed wishes of Congress.

These legal errors are compounded by the discovery order's broadly phrased requests, which imposes the task of identifying and assessing privileges for a significant amount of sensitive material, the overwhelming majority of which would shed no light on the relevant inquiry. The district court's discovery order is thus fundamentally improper and warrants mandamus. This Court recently stayed a similarly overbroad discovery order against USDS pending the government's motion to dismiss and mandamus petition in that case. *See* Order, *In re Musk*, No. 25-5072 (D.C. Cir. Mar. 26, 2025). Relief is similarly warranted here.[1]

## STATEMENT

1.      On January 20, 2025, President Trump signed Executive Order 14,158, establishing USDS as an entity in the Executive Office of the President to help carry out the President's agenda of "modernizing Federal technology and software to maximize governmental efficiency and productivity." *See* 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025). The Order states

---

[1] Plaintiffs oppose this petition and request for a stay.

5

that USDS is led by the USDS Administrator, who reports directly to the White House Chief of Staff. *Id.* The Order further establishes the "U.S. DOGE Service Temporary Organization" as a temporary organization within USDS under 5 U.S.C. § 3161, also led by the USDS Administrator. 90 Fed. Reg. at 8441. And the Order requires USDS to coordinate on efficiency goals with "DOGE Team[s]," which are created by agency heads and composed of employees of those agencies who report to agency leadership. *Id.* at 8441-42.

Various other executive orders include provisions placing advisory responsibilities on USDS or its administrator. For example, Executive Order 14,170 requires the USDS Administrator to "consul[t]" with the Assistant to the President for Domestic Policy to develop a federal hiring plan, "which each agency head shall implement, with advice and recommendations as appropriate from" USDS. 90 Fed. Reg. 8621, 8621-22 (Jan. 30, 2025); *see also* The White House, *Hiring Freeze* (Jan. 20, 2025), https://perma.cc/WK5Y-DE7Z (directing the Director of the Office of Management and Budget (OMB) to submit a plan to reduce the size of the government's workforce, "in consultation with" the USDS Administrator). Executive Order 14,210 directs agency heads, in consultation with DOGE Team leads—agency employees rather than USDS itself—to prepare other

plans regarding hiring to "eliminat[e] waste, bloat, and insularity" within the government, and requires the USDS Administrator to submit a report and various recommendations to the President. 90 Fed. Reg. 9669, 9669-70 (Feb. 11, 2025). And Executive Order 14,218 directs the Administrator of USDS, along with the Director of OMB and in coordination with the Assistant to the President for Domestic Policy, to evaluate "Federal sources of funding for illegal aliens" and "recommend additional agency actions." 90 Fed. Reg. 10,581, 10,581 (Feb. 25, 2025).

The President's executive orders collectively delineate the responsibilities assigned by the President to USDS. *See* Dkt. 24-1 at 20-21 (listing all USDS responsibilities under such orders). USDS has no independent source of legal authority. Other executive orders provide directions to DOGE Team leads at federal agencies (who are employees of their agencies, not USDS), but those orders do not assign any duties to USDS or its administrator. Exec. Order No. 14,219, 90 Fed. Reg. 10583 (Feb. 25, 2025); Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Mar. 3, 2025).

**2.** Plaintiff Citizens for Responsibility and Ethics in Washington submitted a FOIA request to USDS on January 24, 2025, seeking numerous broad categories of information, including "[a]ll communications between the

USDS Administrator and USDS staff," "[a]ll communications between USDS personnel and personnel of any federal agency," and all financial disclosures or ethics pledges executed by USDS personnel. Dkt. 2-6 at 2-3. Less than a month later, on February 20, plaintiff filed suit based on this request and two similar requests submitted to OMB. Plaintiff filed a motion for preliminary injunction the same day, asking the district court to require the USDS to fully process and produce all non-exempt responsive documents no later than March 10, so that plaintiff would have the documents before Congress passed a bill to fund the federal government.

The district court held that plaintiff was not entitled to the preliminary injunction it sought and rejected plaintiff's only theory of irreparable harm (based on the congressional appropriation process). *See* Dkt. 18 at 15-16. The court nevertheless recast plaintiff's request for relief and ordered "USDS to process the request on an expedited basis," predicting that USDS was likely an agency subject to FOIA. *Id.* at 22-28.

USDS thereafter filed an expedited motion for summary judgment so that it could fully brief the important threshold issue whether it was an agency subject to FOIA. *See* Dkt. 24. In response, plaintiff moved for the

expedited discovery at issue here under Federal Rule of Civil Procedure 56(d).

Plaintiffs' requests covered large categories of information regarding USDS's activities since January 20—some of which were sought in its FOIA requests. *See* Dkt. 27-1 at 8-14. The discovery sought included:

a) a deposition of USDS's head, USDS Administrator Amy Gleason, Dkt. 27-1 at 14;

b) identification of "each federal agency contract, grant, lease or similar instrument that any DOGE employee or DOGE Team member recommended that federal agencies cancel or rescind" and "whether that recommendation was followed," *id.* at 8;

c) identification of "each federal agency employee or position that any DOGE employee or DOGE Team member recommended federal agencies terminate or place on administrative leave" and "whether that recommendation was followed," *id.*;

d) identification of "all current and former employees of DOGE and members of DOGE Teams," details of their employment, who oversees them, and what recurring reports they are required to submit, *id.* at 7; and

e)      identification of "each federal agency database or data

management system to which" "any DOGE employee has

attempted to gain, has planned to gain, or plans to gain access,

and whether access was obtained," *id.* at 8.

**3.**      The district court granted the motion for expedited discovery in

significant part.  The court recognized that the determinative inquiry on

summary judgment was whether USDS "could exercise substantial

independent authority" or whether its "sole function is to advise and assist

the President."  Op. 3.  But the court reasoned that this inquiry could not be

resolved solely by reference to the executive orders that were exclusively

responsible for creating USDS and defining its duties because of two

provisions that the court viewed as rendering USDS's authority potentially

"unclear."  Op. 6.  The court acknowledged that the government's

explanation of those purported ambiguities was "[p]erhaps" correct because

the provisions referred not to USDS, but to the "DOGE Team Leads" (who

are agency employees) and the "Department of Government Efficiency" (an

umbrella term including agency DOGE Teams comprised of agency

employees).  Op. 5-6.  Nonetheless, the court found discovery appropriate

because "the record" did not confirm the executive orders' plain meaning

that USDS lacks formal independent authority. *Id.* The court also relied on evidence "in the public record"—chiefly press accounts that the court read as showing that USDS was "leading the charge" on various actions—but the court did not address the government's explanation that those accounts even if true referred to non-USDS entities. *See id.*; Dkt. 24 at 24.

The court therefore granted most of plaintiff's requests. In so doing, the court granted plaintiff's request to depose USDS Administrator Amy Gleason. Op. 8. The court concluded that the deposition was appropriate because Administrator Gleason had submitted a declaration regarding USDS's structure and operations based on the relevant executive orders. The court did not, however, explain why Administrator Gleason's testimony was specifically necessary or contest that another witness could testify as to those subjects under Rule 30(b)(6). *Id.*

The court also granted the request for interrogatories that would require USDS to identify every "recommendation" that any DOGE employee or DOGE Team member made with respect to certain actions regarding grants, contracts, or employment. Op. 10-11. Although the court acknowledged that "advisory" recommendations "need not always be followed," it stated that the government could "assert privilege in its

discovery responses." Op. 10-11. And although the government explained that Agency DOGE Teams are composed of agency employees and are not part of USDS, the court also granted plaintiff's requests for information about Agency DOGE Teams—including information about team members' identities, titles, and tenure, their data access, and the types of reports they submit. Op. 10.

The court thus granted most of plaintiffs' requests (on top of its prior order requiring USDS to begin processing plaintiff's FOIA request before its status as an agency is resolved). Nonetheless, the court stated that "the burden on the defendants … will not be onerous." Op. 7. The district court also denied certain requests plaintiff had made, including for the deposition of USDS official Steven Davis, and for information about USDS's record-keeping policies, prior USDS Administrators, and certain "visitor access requests." Op. 8-9, 11-12.

The district court ordered USDS to provide responses or objections within a mere seven days, provide all responsive documents within 14 days, and allow the completion of depositions within 10 days after the document production.

**ARGUMENT**

**Mandamus is warranted to prevent discovery against an advisory body within the Office of the President.**

This Court may issue a writ of mandamus under the All Writs Act when mandamus would vindicate a "clear and indisputable" right, "no other adequate means" of relief exists, and the writ is "appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004); *see* 28 U.S.C. § 1651. The Supreme Court and this Court have long recognized that a discovery order that improperly intrudes on the separation of powers meets those requirements. *See, e.g.*, *Cheney*, 542 U.S. at 382; *In re Cheney*, 406 F.3d 723, 725 (D.C. Cir. 2005) (en banc). That is true here. The district court's discovery order constitutes a "clear abuse of discretion" in violation of established precedent. *Cheney*, 542 U.S. at 380. The Executive has no recourse to avoid the threat to its interests in autonomy and confidentiality.

    **A.**     **The Supreme Court has made clear that discovery against the Office of the President is reserved for exceptional circumstances and must be a last resort.**

The Supreme Court has repeatedly held that "[t]he high respect that is owed to the office of the Chief Executive … is a matter that should inform the conduct of the entire proceeding, including the timing and scope of

discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). That office's "unique position in the constitutional scheme" "counsel[s] judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982). And because discovery against the Executive Office of the President raises the prospect of a "'constitutional confrontation'" between the Executive and Judicial Branches, the Supreme Court has made clear that it is reserved for exceptional circumstances and that such confrontations "should be avoided whenever possible." *Cheney*, 542 U.S. at 389-90 (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)).

The Supreme Court's decision in *Cheney* illustrates these principles. There, President George W. Bush had established a "National Energy Policy Development Group" within the Executive Office of the President to help develop national energy policy over five months. 542 U.S. at 373. The Group was headed by the Vice President and staffed exclusively by other senior government officials. *Id.* Because the Group was composed entirely of federal government employees, it was not subject to the Federal Advisory Committee Act's open meeting and disclosure requirements. *See id.*

The plaintiffs in *Cheney* brought suit, arguing that the Group was subject to the Act's requirements on the theory that several private persons

were *de facto* members of the Group. 542 U.S. at 374. The plaintiffs then moved for broad discovery into the Group's meetings and activities so that they could establish the private individuals' *de facto* membership. *Id.* at 375. The district court granted that "overly broad" request and "ignored" the Office of the President's asserted interests in protecting the autonomy of the Office's work and the confidentiality of communications on the ground that the government "could assert executive privilege to protect sensitive materials from disclosure." *Id.* at 375, 377, 388-89.

After this Court denied the government's mandamus petition, the Supreme Court reversed, squarely rejecting the reasoning of the district court and court of appeals. *See Cheney*, 542 U.S. at 376-78. The Court emphasized that the case did not present "a routine discovery dispute" and that the courts had failed to take adequate account of the "special considerations" that "control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 385. Given the separation of powers concerns present in those circumstances, the Court made clear that discovery into the actions of the "Office of the President" should be permitted only as a last resort, that district courts must "explore other

avenues" to avoid it, and that courts must ensure that any permitted discovery is "precisely identified" and no broader than necessary to serve its purpose. *Id.* at 387, 390.

The Court also expressly rejected the view that White House defendants may adequately safeguard their interests by asserting privilege over specific documents. *Cheney*, 542 U.S. at 385. To the contrary, the need to "winnow the discovery orders by asserting specific claims of privilege and making more particular objections" was itself a burden on the Executive Branch that raised constitutional concerns. *Id.* at 389. The Court accordingly vacated the denial of mandamus and instructed courts to "be sensitive to requests by the Government for interlocutory appeals" to resolve merits questions that would obviate the need for discovery. *Id.* at 392.

### B. The discovery order here violates separation-of-powers principles under *Cheney* and FOIA precedent.

The district court's discovery order violates the principles that the Supreme Court recognized in *Cheney*. By the express terms of the executive order establishing USDS, that body is an advisory office within the Executive Office of the President that answers to the White House Chief of Staff. *See* 90 Fed. Reg. at 8441. It is well settled that such advisory bodies are not subject to FOIA. *See, e.g.*, *Armstrong v. Executive Office of the*

*President*, 90 F.3d 553 (1996).  Yet the district court authorized plaintiff to embark on a wide-ranging (and expedited) search for information regarding the staff, documents, and activities of USDS.

Particularly egregious is the order's requirement, Op. 10-11, that USDS produce all "recommendation[s]" that USDS has made to agencies about the cancellation or rescission of any "federal agency contract, grant, lease, or similar instrument" or various kinds of employment decisions, Dkt. 27-1 at 8 (interrogatories 6 and 8).  And not only that, but also information on whether the agencies took those recommendations.  *Id.*  The order thus compels disclosure of USDS's advisory role in Executive Branch deliberative processes on topics related to presidential policy initiatives with respect to which USDS is involved in advising and coordinating under executive orders. *See, e.g.*, 90 Fed. Reg. 9669, 9669 (Feb. 14, 2025) (Workforce Optimization Initiative).  And the court did so recognizing that this request would capture "purely advisory," Op. 11, recommendations—*i.e.*, suggestions backed by no formal authority—to *other* decisionmakers who *do* possess the legal authority to act.

In addition, the order requires deposition testimony from the head of USDS, Administrator Amy Gleason—without purporting to find any

"extraordinary circumstances" required to warrant such a measure.  *See, e.g.*, *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985).  In doing so, the district court noted only that Administrator Gleason had provided a declaration about USDS's general structure, a subject that could be covered by a different witness under Federal Rule of Civil Procedure 30(b)(6).  *See* Dkt. 27-1 at 15 (request for deposition on this topic by another witness under Rule 30(b)(6)).  Despite the obvious alternative, the court gave no other basis for demanding such testimony from the head of an entity within the Office of the President who reports directly to the White House Chief of Staff and who is expressly tasked with advising on presidential policy and making recommendations to the President, *see* 90 Fed. Reg. at 9670 (requiring the USDS  Administrator to provide a recommendation to the President).

And the order requires much more besides.  Among other broad requests, the order requires USDS to "[i]dentify all current and former employees" along with numerous details about their hiring and position; numerous kinds of information about USDS's messaging or statements to other agencies regarding data access; "All Interagency Agreements or Memoranda of Understanding" with any agency; "All general terms and

conditions invoices"; "All timekeeping records"; "Any documents" regarding "organization, structure, reporting lines, operational units or divisions, or authority with respect to federal agencies"; "Any mission statement, memorandum, guidance, or other final records" on similar topics; "All" internal "announcements … regarding the appointment or departure of any Administrator"; detailed information regarding data access that USDS has obtained to date; and even non-public "plans" for data access in the future. *See* Dkt. 27-1 at 8-10, 13-14.

These significant intrusions into the Office of the President are similar to the broadbrush discovery rejected by the Supreme Court in *Cheney* and by this Court in *In re Musk*, No. 25-5072 (D.C. Cir. Mar. 26, 2025). The district court believed this discovery was necessary to resolve the question whether USDS is subject to FOIA's regime of compelled disclosure. But as explained below, that question turns on whether USDS is an "agency" with actual, formally conferred, independent authority, not mere influence. Indeed, it is particularly improper to order such intrusive discovery in service of answering whether USDS is even subject to a compelled disclosure regime in the first place, an inquiry that is itself informed and constrained by constitutional concerns. And it is fundamentally backwards to require

production of the information that plaintiff seeks "on the merits" of a FOIA claim (and even more) through discovery.  *See Cheney*, 542 U.S. at 388.

### 1. The requested discovery is not necessary to determine FOIA's applicability.

The district court's error is especially stark given the mismatch between the wide-ranging discovery ordered and the narrow legal question at hand:  whether USDS is an "agency" subject to FOIA.  That threshold inquiry is itself designed to protect sensitive information in the Office of the President from disclosure obligations:  if USDS is not an "agency" under FOIA, FOIA's disclosure obligations do not apply.  The district court believed, however, that answering that threshold question itself necessitates invasive disclosures about the innermost deliberative processes of the president's advisors.  That cannot be right.

In 1974, Congress amended FOIA's definition of "agency" to include any "establishment in the executive branch of the Government (including the Executive Office of the President)."  5 U.S.C. § 552(f).  In adopting that language, Congress codified this Court's prior decision in *Soucie v. David*, 448 F.2d 1067, 1073, 1075 (D.C. Cir. 1971), holding that FOIA applied only to entities with "substantial independent authority" and not to merely advisory bodies that are more properly viewed as "part of the President's staff."  *See*

*Armstrong v. Executive Office of the President*, 90 F.3d, 553, 558 (D.C. Cir. 1996). Accordingly, the Supreme Court has held that the definition's use of the term "'Executive Office' does not include the Office of the President," either "the President's immediate personal staff" or "units in the Executive Office whose sole function is to advise and assist the President." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

As this Court has explained, "Congress exempted" the records of such entities from FOIA partly "to avoid the serious separation-of-powers questions that too expansive a reading of FOIA would engender." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216, 227 (D.C. Cir. 2013). That limit was necessary to protect the Executive's "'constitutional prerogative' to 'maintain the autonomy of its office and safeguard the confidentiality of its communications.'" *Id.* at 224 (alteration omitted) (quoting *Cheney*, 542 U.S. at 385). And consequently, this Court has recognized that "it is doubly [the Court's] obligation" to carefully police the bounds of FOIA by "seek[ing] a construction that avoids constitutional conflict." *Id.* at 227.

Accordingly, to determine whether an entity within the Executive Office of the President is an "agency," this Court has consistently asked one fundamental question: whether the entity's authority goes "beyond advising"

and constitutes "substantial independent authority." *E.g.*, *Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993) (emphasis omitted). And the Court has repeatedly answered that question solely by examining the formal authorities—like executive orders, statutes, or charter documents—that created the entity and set out its duties and responsibilities. *See id.* at 1289 (holding that President Reagan's "Task Force on Regulatory Relief" was not an "agency"); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1041-43 (D.C. Cir. 1985) (similar for Council of Economic Advisers); *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (per curiam) (similar for the Executive Residence); *Pacific Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980) (holding that the Council on Environmental Quality is an agency); *Soucie*, 448 F.2d at 1075 (similar for Office of Science and Technology); *cf. City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (noting that an agency's "power to act … is authoritatively prescribed by Congress" through statutes). In extremely limited circumstances, the Court has also considered narrowly targeted discovery where the entity's authority or structure is unclear. *See Armstrong*, 90 F.3d at 560-61 (considering deposition testimony where there was reason to believe that the National Security Council "could exercise substantial

independent authority" and a delegation in an executive order was "cryptic");
*see also CREW v. Office of Admin.*, 566 F.3d 219, 223-26 (D.C. Cir. 2009)
(reaching same conclusion for the Office of Administration based on legal
authorities and limited discovery, and rejecting a request for broader
discovery).

Notably, this Court has never relied on discovery material to conclude
that an entity within the Executive Office of the President is an agency for
purposes of FOIA when no statute or order could be read to endow the entity
with substantial legal authority independent of the President. Nor has it
ever suggested that wide-ranging discovery into an advisory entity's
activities or "influence" may be taken to answer the question whether that
entity is an agency under FOIA.

To the contrary, both this Court and Congress have taken pains to
exclude advisory bodies in the Executive Office of the President from FOIA
"to avoid serious separation-of-powers concerns that would be raised by a
statute mandating disclosure" of the records of such bodies. *Judicial Watch*,
726 F.3d at 216, 224, 227. Forcing these same entities to disclose their
communications and other documents through discovery raises precisely the
same concerns (in addition to those raised in *Cheney*). And it makes even

less sense to require advisors to the President to divulge information through discovery that is nominally in service of an inquiry to determine whether they are exempted from disclosure requirements in the first place. *Cf. id.* at 457-58 (noting that this Court has barred "end runs" around Congress's intentional exclusion of an entity from FOIA when "separation-of-powers concerns" are implicated).   It is entirely inappropriate to grant a FOIA plaintiff the same—or, here, far greater—disclosure through the vehicle of discovery as he would receive by prevailing on the merits of the FOIA request at issue.  *Cf. Cheney*, 542 U.S. at 388.

Constitutional concerns can be avoided entirely here because the question whether FOIA applies to USDS can be answered solely by looking to the executive orders defining USDS's authority.  Those orders list USDS's authority in purely advisory terms, requiring USDS to, for example: "coordinate" with Agency DOGE Teams comprised of agency employees who "advise their respective Agency Heads on implementing the President's DOGE Agenda," 90 Fed. Reg. at 8441; "consult" with the Assistant to the President for Domestic Policy in developing a federal hiring plan and providing "advice and recommendations as appropriate," 90 Fed. Reg. at 8621-22; identify sources of federal funding for illegal aliens and make

recommendations in coordination with the OMB Director and the Assistant to the President for Domestic Policy, 90 Fed. Reg. at 10,581; consult with the OMB Director on a plan to reduce the size of the federal workforce and regarding the IRS hiring freeze, The White House, *Hiring Freeze* (Jan. 20, 2025), https://perma.cc/WK5Y-DE7Z; "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," 90 Fed. Reg. at 8441; access various data systems, *id.* at 8442; and receive various kinds of informational reports, 90 Fed. Reg. at 9670; 90 Fed. Reg. at 11,096. None of these advisory authorities constitutes the kind of independent authority that could render an entity an "agency" under FOIA. *See, e.g.*, *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979) (holding that OMB is an agency because of its numerous "statutory dut[ies]" separate from advising).

The district court mistakenly believed that, "even if … the executive orders could be read to suggest a more advisory role," they were rendered "unclear" by two purported ambiguities that the court declined to resolve. Op. 5-6. Neither ambiguity exists.

First, the court noted that the purpose section of USDS's establishing executive order states that "[t]his Executive Order establishes the Department of Government Efficiency to implement the President's DOGE Agenda," and reasoned that the term "implement" is ambiguous. 90 Fed. Reg. at 8441; Op. 5. But as explained, *supra* pp. 6, 10-11, that order established a policy initiative with several component parts and used the umbrella term "Department of Government Efficiency" to include not only USDS, but also agency employees who are on their agency's DOGE Teams. *See* 90 Fed. Reg. at 8441 (establishing "DOGE Structure"). In any event, creating an advisory body to coordinate the President's policy and make recommendations is clearly a way to "implement" the President's goals, so use of that word can hardly create ambiguity in the face of express, more specific delineations of USDS's authority and the absence of any conferrals of formal power.

Second, the court noted (Op. 5-6) a provision in Executive Order 14210 stating that "[t]he agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines" otherwise. 90 Fed. Reg. at 9670. Again, however, DOGE Team Leads are not USDS; they are *agency employees* acting under the

direction of the *agency head*.  Those agencies are generally subject to FOIA, so records about the activities of DOGE Team Leads could be sought directly from those agencies.  And besides, if the agency head has plenary authority to override the assessment of the DOGE Team Lead, then the lead does not exercise any substantial independent authority, no matter where she is employed.

Having incorrectly brushed aside the controlling executive orders, the district court then strayed from this Court's precedents in treating the inquiry as the degree of "USDS's influence over other federal agencies" or "whether USDS employees … influence those agencies," and using that formulation to justify broad discovery into recommendations made by USDS and how often those recommendations are followed.  Op. 4, 10, 12.

But giving "recommendations" does not establish that an advisory body exercises substantial authority independent of the President, even if those recommendations are often followed.  Every advisory body makes recommendations; the district court's approach would make all manner of bodies within the White House into FOIA "agencies," contrary to the Supreme Court's instructions.  *See Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 (D.C. Cir. 1993) (describing

historical examples of influential advisors). And predictably, many advisory bodies within the Executive Office of the President will be very effective in persuading others to follow their advice. As this Court explained in *Meyer*, "senior White House officials close to the Presiden[t] often give ad hoc directions to executive branch personnel," but when this occurs, "it is assumed that they merely are passing on the President's wishes." 981 F.2d at 1293-94 (emphasis omitted). One would expect the President's wishes to be followed, making discovery into the uptake of USDS recommendations especially meaningless.

For the same reason, the court's heavy reliance on press characterizations about DOGE entities "leading the charge" on various policy initiatives was mistaken. Op. 6. Such a characterization of activities is irrelevant, as senior advisors frequently spearhead the President's policy agenda without possessing substantial independent authority. That is to say nothing of whether the press reports are even accurate. Moreover, as the government had explained, the reports do not refer to USDS activities; they mention Elon Musk (a White House advisor), agency activities (which would be activities of agency DOGE Teams or Team Leads), or refer generally to "DOGE," an umbrella term for the Executive-wide initiative. Dkt. 24-1 at 24.

Because the question whether USDS is an agency subject to FOIA turns on whether it has formally conferred substantial authority independent of the President, and the Executive Orders that created USDS and prescribe USDS activities directly answer that question, the district court grievously erred by ordering any discovery. That decision is irreconcilable with the careful approach required for discovery against advisory bodies within the Executive Office of the President. And here, the use of discovery to assess FOIA's application leads to greater burdens on the separation of powers, when all along the inquiry regarding FOIA's reach is designed to limit such intrusions. Indeed, if plaintiffs can get such broad discovery merely by bringing a FOIA suit and alleging influence, the mere filing of a FOIA complaint could become a routine mechanism to obtain compelled disclosure of records from advisory bodies and the Office of the President, even if those suits never succeed on the merits.

### 2. To the extent any discovery is proper, it must be limited to assessing USDS's formal authority.

Even if the district court had correctly identified some lack of clarity in the executive orders that would justify some measure of discovery, its order reflects a fundamental failure to be "mindful of the burdens imposed on the Executive Branch." *Cheney*, 542 U.S. at 391-92. Again, *Cheney* is

29

instructive.  There, plaintiffs argued that the Task Force in the Executive Office of the President was subject to disclosure requirements under the Federal Advisory Committee Act because of *de facto* private members, and asked for broad discovery to prove that those disclosure obligations applied. *Id.* at 374-75.  Nonetheless, the Court explained that the "everything under the sky" discovery covering "[a]ll documents identifying … any staff … of the Task Force" and virtually all of the Task Force's activities was "overly broad." *Id.* at 386-87.  Before ordering such discovery, the district court needed to "explore other avenues" that may have obviated the need for discovery or at least significantly reduced its scope. *Id.* at 390.

The discovery requests here closely resemble the *Cheney* requests. And here, too, even if it could be reasonably questioned whether USDS's authorities go beyond giving advice and assistance, USDS is indisputably an advisory body to the President, *e.g.*, 90 Fed. Reg. at 9670, meaning that any inquiry into its advice-giving functions runs clear separation-of-powers risks.

Yet the district court failed to consider other options, such as to prioritize formal authority arguments in the government's summary judgment motion (and potentially certifying those arguments for appeal). *See Cheney*, 542 U.S. at 391-92 (encouraging courts to "be sensitive to

requests by the Government for interlocutory appeals" that could dispose of the case without discovery).  Indeed, the court declined even to resolve the meaning of the relevant Executive Orders, acknowledging that the government's explanation of the purported ambiguities was "[p]erhaps" correct.  Op. 5.  The court offered no justification for deferring that critical legal inquiry until *after* discovery.

Moreover, even if the court concluded that FOIA's applicability could not be determined solely by reference to the executive orders setting forth USDS's responsibilities, it was incumbent on the district court to ensure that any discovery ordered be as minimally intrusive as possible to resolve the question of USDS's formal authority.  In contrast to the district court's expansive order, however, only a small number of plaintiffs' discovery requests could be reasonably necessary for that purpose.  Document requests 5 and 7, for example, call for "[a]ll final directives, or announcements of final directives" from the USDS Administrator or any USDS employee "to any DOGE Team or federal agency."  Dkt. 27-1 at 12.  To the extent that USDS employees formally ordered an agency employee to take action based solely on USDS's own formal authority (rather than advising an agency decisionmaker to take such an action), narrow discovery

on that question could be a more targeted way to assess the entity's substantial independent authority. Document request 9 calls for "[a]ny mission statement, memorandum, guidance, or other final records delineating the scope of DOGE's or any DOGE Team's authorities, functions, or operations." *Id.* As explained above, DOGE Team members are employees of federal agencies and act pursuant to the authorities conferred upon those agencies by statute, so their activities are not relevant. But a request limited only to such documents regarding authorities, functions, or operations of USDS itself could be a narrower way of assessing the entity's authority.

The court's failure to consider alternatives is particularly pronounced as to the deposition it ordered of USDS's head. As this Court has often recognized, depositions of high-ranking officials are generally inappropriate and require "extraordinary circumstances." *See, e.g.*, *Simplex*, 766 F.2d at 586; *In re Clinton*, 973 F.3d 106, 112-13 (D.C. Cir. 2020) (granting mandamus); *In re U.S. Dep't of Educ.*, 25 F.4th 692, 701 (9th Cir. 2022) (collecting cases). Here, Administrator Gleason is the head of an advisory body within the Executive Office of the President, reports directly to the White House Chief of Staff, and is expressly tasked with providing advice,

recommendations, and coordination for various policy initiatives, including providing recommendations to the President.  *See e.g.*, 90 Fed. Reg. at 9670. Yet the district court's rationale for ordering her deposition did not even attempt to show necessity, much less extraordinary circumstances.

The district court made much of the fact that Administrator Gleason had been a declarant in the case.  Op. 8.  But the only subject matter about which Administrator Gleason had provided a declaration is USDS's structure, and the court gave no reason why another declarant could not testify on that general topic under Rule 30(b)(6).  Indeed, plaintiff itself requested for the government to furnish a USDS representative (rather than Administrator Gleason specifically) to address those precise topics under Rule 30(b)(6).  *See* Dkt. 27-1 at 14.  Yet the court persisted in allowing Administrator Gleason's deposition without giving full weight to alternatives and despite the principle that "[t]he duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere."  *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam).

### 3. The discovery order's breadth imposes significant burdens on the Executive Branch.

The district court likewise violated established principles in its analysis of the burdens on the Office of the President. Most obviously, the order requires a deposition of the USDS head, an inherently burdensome requirement that distracts from USDS's mission. In addition, the order includes broadly phrased requests for large categories of information that, on their face, would require significant resources to gather and process. (This is at the same time the district court has ordered USDS—which has fewer than 100 employees and no dedicated FOIA staff—to process 1,000 pages a month on plaintiffs' FOIA request, when it is not yet established whether USDS is even subject to FOIA in the first place.)

Perhaps most notable in this respect are interrogatories 6 and 8, which require the identification of every "federal agency contract, grant, lease or similar instrument that any DOGE employee or DOGE Team member recommended that federal agencies cancel or rescind" and every "federal agency employee or position that any DOGE employee or DOGE team member recommended" for termination or placement on administrative leave. Dkt. 27-1 at 8.

It is unclear, to say the least, how anyone could construct a comprehensive search for such "recommendations," a capacious and vague term. Providing recommendations is quite literally at the core of what USDS does. *See, e.g.*, 90 Fed. Reg. at 8622; 90 Fed. Reg. at 10,581. And the district court's assertion (Op. 11) that the line between recommendations and directives is "blurry" would be a reason to order discovery that is "precisely identified" and no broader than necessary to serve its purpose—as *Cheney* requires—not a reason to adopt a sweeping approach that encompasses clearly sensitive information even when that information is not relevant to the question at hand. 542 U.S. at 387, 390. Plaintiffs' requests for recommendations are, ultimately, a thinly disguised fishing expedition into USDS's *advisory* activities under the guise of determining whether USDS engages in *non*-advisory activities—an approach to discovery that is improper in any circumstance and even more so here.

Moreover, these interrogatories seek information that is likely privileged —indeed, almost by definition—under the deliberative process privilege. *See Cheney*, 542 U.S. at 388 (explaining that the need to raise privileges is itself a burden). Unsurprisingly, recommendations are frequently predecisional and deliberative. Moreover, the likelihood that the

government may have to raise executive privileges on behalf of a White House defendant, thereby setting the Executive and Judicial Branches on a course for "constitutional confrontation," is a reason to *avoid* discovery, not to *grant* it. *Id.* at 387-89 (finding "no support for the proposition that the Executive Branch shall bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections").

Other parts of the sprawling discovery requests will similarly "require the Executive Branch to bear the onus of" analyzing potential ambiguities or privilege issues "line by line." *Cheney*, 542 U.S. at 388. For example, the order requires defendants to identify "each federal agency database or data management system to which, since January 20, 2025, any DOGE employee has attempted to gain, has planned to gain, or plans to gain access, and whether access was obtained." Dkt. 27-1 at 9. The reference to "attempts" and "plans" is both sprawling and will inevitably implicate extensive privileged material. The order also reaches all final directives to any agency in any form (including electronic communications); all agreements of various kinds with any agency; all "terms and conditions invoices"; all timekeeping; all documents regarding "organization, structure, reporting lines, operational units or divisions"; memoranda or guidance on similar topics; and detailed

information regarding employees and supervisors, hiring, and related internal reports. *See* Dkt. 27-1 at 8-14.

Moreover, even though the district court limited discovery to information within USDS's control, the court nonetheless ordered discovery regarding DOGE Teams that are composed of employees at agencies. Op. 10. Because USDS frequently interacts with those teams in an advisory capacity, the court's order effectively requires USDS to trawl its records for responsive information that it may have picked up in piecemeal fashion based on its ad hoc interactions with employees at other agencies. Plaintiff's expansive requests are strikingly similar to the "everything under the sky" requests in *Cheney* and may even go beyond them. *See* 542 U.S. at 385, 387.

The district court blithely asserted that "the burden on the defendants … will not be onerous." Op. 7. But compliance with its discovery order intrudes upon the prerogatives and autonomy of the Office of the President, results in the loss of confidentiality of that Office's communications, and burdens the Executive with the task of assessing and invoking privilege over wide range of information, all of which cause irreparable harm to the government. The court's failure to recognize the irreparable burdens of discovery as to an advisory body within the Office of the President is

irreconcilable with established principles. "[T]he public interest requires that a coequal branch of Government 'afford Presidential confidentiality the greatest protection consistent with the fair administration of justice'" because of the "paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney*, 542 U.S. at 382 (quoting *Nixon*, 418 U.S. at 715).

\* \* \*

In short, the district court's far-reaching discovery order contravenes well-established principles of "judicial deference and restraint" in the conduct of litigation involving the Office of the President and ignores the substantial separation-of-powers concerns that plaintiff's discovery requests raise. *Nixon*, 457 U.S. at 753. The court's order of such discovery as a means of assessing whether FOIA applies to an advisory body within the Executive Office of the President is inconsistent with the foundational premise of that inquiry, which is that disclosure of information from such a body would present serious constitutional questions and should be avoided. The order also inappropriately covers information that plaintiff seeks on the merits of its FOIA request. And the order's breadth intrudes upon the most

sensitive areas of a White House advisory body, including by reaching recommendations and requiring a deposition of USDS's head.

Because the government has no alternative means for remedying the court's clear violation of established law and the irreparable intrusion on the functioning of the Executive Branch that it represents, mandamus is warranted. The Court should make clear that discovery into the Office of the President is reserved for exceptional cases and must be narrowly targeted.

## CONCLUSION

For the foregoing reasons, this Court should grant this petition for a writ of mandamus to quash the discovery order. The Court should also stay the discovery order pending resolution of this petition, as requested in the accompanying stay motion.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
  *General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
THOMAS PULHAM
  *s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7323*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *joshua.y.dos.santos@usdoj.gov*

April 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,784 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 21(d) and 32(c) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*

_____

JOSHUA DOS SANTOS

# CERTIFICATE OF SERVICE

I certify that, on April 18, 2025, I electronically filed this petition through this Court's CM/ECF system. I also certify that five copies of the petition will be delivered to the D.C. Circuit.  I further certify that the petition has been served on counsel by email on April 18, 2025, and will also be served by first-class mail.  Finally, I certify that the petition has been served on the district court via email on April 18, 2025, and will be delivered by courier on the next business day.

*s/ Joshua Dos Santos*

_____

JOSHUA DOS SANTOS

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     Parties and Amici.

The defendants are U.S. DOGE Service; Amy Gleason in her official capacity as Administrator of the U.S. DOGE Service; Elon R. Musk in his official capacity; the Office of Management and Budget; Russell Vought in his official capacity as Director, Office of Management and Budget; National Archives and Records Administration; and Marco A. Rubio in his official capacity as Acting Archivist of the United States.

The plaintiff in the district court is Citizens for Responsibility and Ethics in Washington.

## B.     Rulings Under Review.

Petitioners seek a writ of mandamus regarding the district court's memorandum opinion and order on April 15, 2025 (Dkt. No. 38) granting in part the plaintiffs' motion for expedited discovery.

## C.     Related Cases

Counsel is not aware of any related cases.

*/s/ Joshua Dos Santos*
JOSHUA DOS SANTOS

# ADDENDUM

# TABLE OF CONTENTS

Memorandum Opinion (Apr. 15, 2025) ..................................................A2

Discovery Requests ...............................................................................A14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, |
| Plaintiff, |
| v. |
| **U.S. DOGE SERVICE,** et al., |
| Defendants. |

Case No. 25-cv-511 (CRC)

## OPINION AND ORDER

This case concerns three Freedom of Information Act ("FOIA") requests lodged by Citizens for Responsibility and Ethics in Washington ("CREW") seeking information about the recently formed United States DOGE Service ("USDS"). CREW filed two requests with the Office of Management and Budget ("OMB") and the third with USDS itself. While OMB has agreed to take up CREW's requests on an expedited basis, USDS initially declined to process CREW's request at all on the ground that it is not an agency subject to FOIA. The Court disagreed, holding that USDS is likely an agency subject to FOIA and entering a preliminary injunction requiring expedited processing of CREW's request.

USDS then moved for summary judgment, reiterating its position that USDS is not an agency subject to FOIA. In response, CREW filed a motion for expedited discovery under Federal Rule of Civil Procedure 56(d), seeking information relevant to whether USDS wields substantial authority independent of the President and is therefore subject to FOIA. USDS opposed CREW's motion, contending that CREW is not entitled to discovery at all and that, even if some limited discovery is appropriate, CREW's requests stretch too broadly.

A2

For the reasons that follow, the Court holds that CREW is entitled to limited discovery. The Court will, however, limit CREW's requests to some extent.

## I.    Background

The Court incorporates the factual and procedural background from its memorandum opinion partially granting CREW's motion for a preliminary injunction and its opinion and order denying USDS's motion for reconsideration of the preliminary injunction ruling.  See Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv. ("CREW I"), No. 25-cv-511 (CRC), 2025 WL 752367, at *1–6 (D.D.C. Mar. 10, 2025); Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv. ("CREW II"), No. 25-CV-511 (CRC), 2025 WL 863947, at *1–2 (D.D.C. Mar. 19, 2025).

To briefly summarize: USDS, a unit within the Executive Office of the President, has reportedly spearheaded efforts to terminate federal workers, programs, and contracts across the federal government since President Trump took office in January 2025.  Seeking to learn more about USDS, CREW filed two FOIA requests with OMB and one with USDS itself.  After CREW sought emergency relief, the Court entered a preliminary injunction ordering expedited processing of the USDS Request, though it declined to order processing of any of the requests by a date certain.  CREW I, 2025 WL 752367, at *10–16.

The government then filed a motion for partial reconsideration asking the Court to reconsider the portions of its opinion directing USDS to process the USDS request, provide an estimate of responsive documents, and propose a schedule for expedited processing.  CREW II, 2025 WL 863947, at *2.  As the basis for its motion, the government argued that the Court had erred by concluding that USDS is likely an agency subject to FOIA.  Id. at *3.  The Court denied the government's motion, but noted that it was "free to file its summary judgment motion

imminently, as it has indicated it will do." Id. at *2.  Once that motion was filed, the Court

indicated that it would "entertain a motion from CREW under Rule 56(d) to conduct limited

discovery to develop facts relevant to USDS's status as an agency under FOIA." Id.

USDS filed its summary judgment motion, and CREW subsequently moved for limited

expedited discovery under Rule 56(d).  For the reasons that follow, the Court will grant CREW's

motion in part.

## II.   Legal Standards

To determine whether expedited discovery is appropriate, the Court considers the

"reasonableness of the request in light of all of the surrounding circumstances." Guttenberg v.

Emery, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (citation omitted).  These include: "(1) whether a

preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for

requesting the expedited discovery; (4) the burden on the defendants to comply with the requests;

and (5) how far in advance of the typical discovery process the request was made." Id.

## III.  Analysis

### A.  CREW is Entitled to Limited Discovery

USDS seeks summary judgment on the ground that USDS is not an agency subject to

FOIA.  As the Court explained in its prior opinions, to conclude that "an EOP unit is subject to

FOIA," there must be "a finding that the entity in question 'wielded substantial authority

independently of the President.'" Citizens for Resp. & Ethics in Wash. v. Off. of Admin.

("OA"), 566 F.3d 219, 222 (D.C. Cir. 2009) (citation omitted).  That analysis trains on whether

an entity within EOP "could exercise substantial independent authority" and whether it "does in

fact exercise such authority." Armstrong v. Exec. Off. of the President, 90 F.3d 553, 560 (D.C.

Cir. 1996).  If instead the unit's "sole function is to advise and assist the President," it is not an

agency.  Alexander v. FBI, 456 F. App'x 1, 1–2 (D.C. Cir. 2011) (quoting Kissinger v. Reps.
Comm., 445 U.S. 136, 156 (1980)).  CREW, in response, seeks expedited discovery on USDS's
influence and operations for purposes of determining whether it is exercising the requisite
authority subjecting it to FOIA.  Mot. for Expedited Discovery at 1.

       As the government acknowledges, courts in this district have permitted limited discovery
in just these circumstances—to ascertain whether an entity is wielding independent authority
sufficient to bring it within FOIA's ambit.  For instance, when considering whether FOIA applies
to the Office of Administration within EOP, the district court "allowed CREW to conduct limited
jurisdictional discovery to explore 'the authority delegated to [OA] in its charter documents and
any functions that OA in fact carries out.'"  OA, 566 F.3d at 221 (citation omitted).  Similarly,
when the government argued that the Office of Homeland Security ("OHS") was not an agency
subject to FOIA, the court ordered limited discovery, reasoning that the plaintiff's request was
"necessary and relevant" in the absence of "evidence that is definitive on the issue of OHS's
agency status."  EPIC v. Off. of Homeland Sec., No. 02-cv-00620-CKK, ECF No. 11, at 10, 12
(D.D.C. Dec. 26, 2002); see also Armstrong, 90 F.3d at 560 (considering National Security
Council staff declaration to determine its agency status); Meyer v. Bush, No. 88-cv-3112-JHG,
1991 WL 212215, at *6 (D.D.C. Sept. 30, 1991), rev'd on other grounds, 981 F.2d 1288 (D.C.
Cir. 1993) (relying on letters, memoranda, and the Vice President's public statements in
considering FOIA's applicability to Presidential Task Force on Regulatory Relief).

       Just recently, Judge Bates partially granted the plaintiffs' motion for expedited discovery
seeking "facts that bear on [the] irreparable harm" imposed by USDS employees' access to
individual information protected by the Privacy Act of 1974.  AFL-CIO, No. 25-cv-339-JDB,
ECF No. 48, at 8 (D.D.C. Feb. 27, 2025).  The court reasoned that "the structure of USDS and

the scope of its authority" were "unclear on the current record" and "critical to deciding the question of whether USDS is an agency within the meaning of the Economy Act of 1933—and thus whether its employees are permitted by the Privacy Act to view individual information." Id. Accordingly, limited discovery was appropriate. Id.

So too here. The structure of USDS and the scope of its authority are critical to determining whether the agency is "wield[ing] substantial authority independently of the President." OA, 566 F.3d at 222. And the answers to those questions are unclear from the record. Resisting this conclusion, the government principally argues that the language of the President's executive orders indicate that USDS's function is merely advisory. Opp'n at 4–5. But these executive orders cannot bear the weight the government assigns to them for two reasons.

First, the language of the President's USDS-related executive orders, far from resolving the question against CREW, in fact suggests that USDS is exercising substantial independent authority. As the Court already noted, the executive order establishing USDS "to implement the President's DOGE Agenda" appears to give USDS the authority to carry out that agenda, "not just to advise the President in doing so." CREW I, 2025 WL 752367, at *11. President Trump's subsequent executive order also "grants the USDS Team Lead the power to keep vacant career positions open unless an agency overrides their decision." Id. USDS responds that the language highlighted by the Court refers "to the entire DOGE structure (including DOGE Teams at federal agencies)." Id. Perhaps. But contrary to the government's position, nothing in the record conclusively establishes that USDS representatives embedded within agencies act independently of USDS. In fact, the relevant executive orders suggest the opposite. For instance, agencies are required to "coordinate [the DOGE Teams'] work with USDS." See Exec. Order No. 14158,

Establishing and Implementing the President's "Department of Government Efficiency," 90 Fed. Reg. 8441 (Jan. 29, 2025). And as another court in this district recently observed, "DOGE Team members are also selected in part by USDS, and USDS helps form the contours of their duties." AFL-CIO, No. 25-cv-339, ECF No. 75, at 3 n.4.

Accordingly, even if other parts of the executive orders could be read to suggest a more advisory role, the implication left by USDS's charter documents is unclear at best. And that weighs in favor of permitting limited discovery, not against it. See EPIC, No. 02-cv-620-CKK, ECF No. 11, at 12 (ordering discovery because "the language" of the executive order "establishing the [OHS's] power [was] broad and lacking in firm parameters").

Second, USDS's focus on its charter documents ignores evidence in the public record that USDS is exercising substantial authority across vast areas of the federal government. In its prior opinion, the Court referenced news articles reporting that USDS "likely drove the charge to shutter USAID," "eliminated 104 DEI-related contracts with the federal government," and otherwise exercised authority to "identify and terminate federal employees, federal programs, and federal contracts." CREW I, 2025 WL 752367, at *11. The Court emphasized, as well, that these articles characterized USDS as "reportedly [] leading the charge on these actions, not merely advising others to carry them ." Id. And the Court cited other cases finding that USDS "has taken numerous actions without any apparent advanced approval by agency leadership." Op. Denying Mot. for Recons., ECF No. 23, at 11 (citing Does 1- 26 v. Musk, No. 25-cv-462, 2025 WL 840574, at *3 (D. Md. Mar. 18, 2025)). Because the public record contradicts USDS's already disputable interpretation of the relevant executive orders, discovery is particularly appropriate here.

The other factors that the Court considers when assessing whether to order expedited discovery point in the same direction.  CREW is not currently seeking a preliminary injunction, but it has already obtained emergency relief.  That relief will not be fully effectuated until the Court rules on USDS's expedited summary judgment motion, however, since the Court has indicated that it will not order USDS to produce documents until after that ruling.  See Guttenberg, 26 F. Supp. 3d at 98.  And, especially given modifications to CREW's requests which the Court will next discuss, the burden on the defendants to comply with the requests will not be onerous.  Id.[1]

B.  Specific Requests at Issue

Next, the Court considers whether CREW's discovery request are properly scoped.  USDS raises several objections to CREW's requests.  The Court will take each in turn.

1.  Depositions

CREW seeks to depose three witnesses: a USDS representative designated under Federal Rule of Civil Procedure 30(b)(6), USDS Administrator Amy Gleason, and Steven Davis, who has been reported as leading USDS's daily operations.  Mot. for Expedited Discovery at 17, id., Maier Decl. ¶ 30.  USDS responds by asking the Court to limit any discovery to written discovery only, or, at most, permit a single Rule 30(b)(6) deposition.  Opp'n at 8, 10 ("[I]f the Court concludes that depositions are needed, Defendants do not object to the Court's approval of a single 30(b)(6) deposition.").

---

[1]  As noted in the Court's prior opinion, "USDS also provides no reason why the existing FOIA office at OMB, or those elsewhere within the Executive Office of the President, could not assist with processing the narrow USDS Request."  CREW II, 2025 WL 863947, at *8.

"Rule 30(b)(6) requires an organization to identify a person knowledgeable on a noticed topic and to prepare that person to testify as to that topic, thus binding the entity." Prasad v. George Washington Univ., 325 F.R.D. 1, 6 (D.D.C. 2018). If USDS desires, of course, it may select USDS Administrator Amy Gleason as its Rule 30(b)(6) representative. If USDS does not select Administrator Gleason as its Rule 30(b)(6) representative, however, a deposition of Ms. Gleason is additionally appropriate. USDS first submitted a declaration from Ms. Gleason in support of its motion for reconsideration, which detailed her knowledge of USDS's structure and operations. Mot. for Recons., Gleason Decl. Moreover, USDS's motion for summary judgment largely relies on a second declaration from Ms. Gleason on the same topic. Mot. for Summ. J., Attachment 2 (Gleason Decl.). Given that Ms. Gleason's declaration is the only factual evidence offered in support of USDS's summary judgment motion, CREW is naturally entitled to question her. That determination is consistent with the Court's prior observation that parts of Gleason's declaration appear to be "called into question by contradictory evidence in the record." Op. Denying Mot. for Recons. at 10 (citing Jud. Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 215 (D.C. Cir. 2013)). See AFL-CIO, No. 25-cv-339, ECF No. 48, at 9 ("It would be strange to permit defendants to submit evidence that addresses critical factual issues . . . without permitting plaintiffs to explore those factual issues through very limited discovery").

On the other hand, the Court will not at this juncture order the deposition of Steven Davis. CREW describes Mr. Davis as "a DOGE employee who has been widely reported to be the day-today manager of DOGE's operations and a close associate of Mr. Musk." Maier Decl. ¶ 30. But Mr. Davis has not submitted a declaration in support of the government's motion for summary judgment, and CREW provides no reason why Mr. Davis is uniquely positioned to answer questions that USDS's Rule 30(b)(6) representative or Ms. Gleason could not.

2. *Record-Keeping Policies*

The government next identifies several topics which "either are irrelevant to resolving USDS's summary judgment motion or, to the extent they are marginally relevant, would be unduly burdensome." Opp'n at 12. As to some of these, the Court agrees with USDS.

USDS first objects to CREW's request for information about the agency's record-keeping practices. Specifically, USDS objects to CREW's proposal to depose a 30(b)(6) deponent on "DOGE's recordkeeping and retention policies and practices," Document Request 14 seeking "[a]ll documents describing DOGE's record retention and preservation policies, including those relating to the @DOGE X account," and Interrogatory 11, which asks USDS to "[i]dentify whether any DOGE employee or DOGE Team member has used or presently uses non-official messaging systems or applications with auto-delete functionality, including but not limited to Signal, to conduct government business." Id. at 13. These requests may be grounded in legitimate concerns about USDS's compliance with federal record-keeping requirements. But they are largely irrelevant to the issue at hand. That is, they do not bear on the question presented by USDS's motion for summary judgment, which is whether the agency is wielding substantial independent authority subjecting it to FOIA.

CREW responds that "[q]uestioning on these topics is also necessary to ascertain whether documents that would otherwise have been produced in the course of discovery have been lost or are unretrievable because of DOGE's lack of document preservation measures." Reply at 12. The Court disagrees. While the Court certainly expects USDS to comply with its preservation order—which USDS has indicated it will do—discovery on that issue is tangential to the pending summary judgment motion.

### 3. Materials from Agency USDS Teams

Next, the government objects to all requests that "require USDS to collect and provide information about Agency DOGE Teams." Opp'n at 16. The government argues that such information is irrelevant because "[a]gency DOGE Teams are employees of the agencies to which they are assigned" and are subject to FOIA. Id. at 16. Here, the government misses the mark. Whether or not agency USDS detailees are otherwise subject to FOIA, their actions, and particularly the extent to which USDS is directing them, is relevant to assessing USDS's authority. If Agency DOGE teams are complying with orders from USDS leadership, that speaks to USDS's influence over other federal agencies.

The government asserts that it "does not have visibility into everything DOGE Team members do at their respective agencies, how they are supervised, what reports they submit within their agencies, how they record their time, and any directives they give within their agencies." Opp'n at 17. CREW, however, has clarified that its document requests only seek documents "within [USDS]'s custody, control, or possession." Reply at 14. The same limitation would apply to a Rule 30(b)(6) deposition: the deponent need testify only to matters within USDS's collective knowledge.

### 4. USDS Recommendations

Next, USDS objects to CREW's Interrogatories 6 and 8. Interrogatory 6 would ask USDS to "[i]dentify each federal agency contract, grant, lease, or similar instrument that any DOGE employee or DOGE Team member recommended that federal agencies cancel or rescind since January 20, 2025, and whether that recommendation was followed." Interrogatories, ECF No. 27-1, at 8. Similarly, Interrogatory 8 asks USDS to "[i]dentify each federal agency employee or position that any DOGE employee or DOGE Team member recommended federal

agencies terminate or place on administrative leave since January 20, 2025 and whether that recommendation was followed."  Id.

USDS objects first that these requests "definitionally could not result in information that would aid CREW in its efforts to show that USDS wields substantial authority independent of the President" because recommendations need not always be followed.  Opp'n at 18.  True, if the recipient of those recommendations viewed them as purely advisory.  But that is just the question.  The line between a recommendation and directive is a blurry one, and CREW is attempting to determine whether USDS's "purported 'recommendations' are always followed (or almost always followed)."  Reply at 15.  That question is relevant to the authority USDS exercises over federal agencies.  USDS also objects that requests related to its recommendations "seek information that is likely privileged."  Opp'n at 18.  But even if true, USDS may assert privilege in its discovery responses "as CREW's proposed discovery requests explicitly instruct." Id. at 15.

### 5. Other Objections

The government also objects to Interrogatory 3, which asks USDS to "[i]dentify each Administrator since January 20, 2025, the dates during which each person held that position, whether they interviewed for that position, with whom they interviewed, and who first informed them that they had been appointed to that position."  Interrogatories at 7.  USDS complains that this interrogatory "has no bearing on whether USDS is a FOIA/FRA agency."  Opp'n at 19.  The Court agrees.  CREW has not shown how the specifics of who served as USDS Administrator or interviewed for the position bears on USDS's authority.

The government also objects to Interrogatory 9, which asks USDS to "[i]dentify each federal agency database or data management system to which, since January 20, 2025, any

DOGE employee has attempted to gain, has planned to gain, or plans to gain access, and whether access was obtained." Interrogatories at 8. In response, CREW proposes narrowing the scope of this interrogatory to systems that store classified or sensitive information. Reply at 17. As narrowed, the Court concludes that CREW's discovery request is appropriate. USDS's employee access to sensitive systems is an indicator of its authority, especially if such access was obtained over the objection of agency officials, as has been reported. CREW I, 2025 WL 752367, at *12. Nor should this request present a burden for USDS, since it has been ordered to disclose similar information in the aforementioned case before Judge Bates.

USDS also complains that it does not "collect information at a more granular level about the specific agency systems to which particular detailees/dual employees have access." Opp'n at 20. But as already noted, to the extent USDS does not have this information in its custody, control, or possession—or within its collective knowledge for purposes of the Rule 30(b)(6) deposition—it need not conduct further investigation within other agencies. See Reply at 14.

USDS next objects to Document Request 2, which seeks "visitor access requests" concerning "any DOGE employee detailed to, otherwise working at, or accessing the offices of, federal agencies." Interrogatories at 8, 12. The Court agrees that this is request seeks irrelevant information. It is not disputed that USDS employees have access to the offices of federal agencies. The question is whether USDS employees are using that access to influence those agencies, which is targeted by CREW's other requests.

Lastly, USDS notes that Interrogatory 12 and Document Request 13 "address communications through the @DOGE X account" which is "not owned by USDS." Opp'n at 20. Although the Court is somewhat baffled by this, USDS has nonetheless agreed to "make a reasonable effort to provide information responsive to this Interrogatory and Request to the

extent that such information is within its possession, custody, and control." Id.  The Court therefore need not linger over this request.

**IV.  Conclusion**

For the reasons explained above, it is hereby

**ORDERED** that [27] plaintiffs' motion for expedited discovery is GRANTED in part, subject to the alterations the Court has explained in this Order; and it is further

**ORDERED** that Defendants:

Serve responses and objections to Plaintiff's Discovery Requests within 7 days of the date of this order;

Produce all responsive documents within 14 days of the date of this order; and it is further

**ORDERED** that all depositions be completed within 10 days from the deadline for producing documents.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: April 15, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-511 |
| U.S. DOGE SERVICE, *et al.*, | |
| Defendants. | |

## PLAINTIFF'S [PROPOSED] FIRST DISCOVERY REQUESTS

Pursuant to Federal Rule of Civil Procedure 26, 33, 34, and 36, and Local Civil Rule 26.2, Defendants U.S. DOGE Service and the Administrator of the U.S. DOGE Service are requested to answer and respond to the following interrogatories, requests for admission, and requests for production (collectively, the "Discovery Requests") propounded by undersigned counsel for Plaintiff Citizens of Responsibility and Ethics in Washington ("CREW") separately and fully, in writing, under oath, to the best of your ability from knowledge you are able to obtain from any and all sources available to you, your agents, or your attorneys, and respond to these discovery requests as follows:

- Serve written responses and any objections to these Discovery Requests within 7 days of the Court's order granting discovery;

- Produce all responsive documents to Plaintiffs' request for production within 14 days of the Court's order granting discovery; and

- Complete all depositions within 10 days from the deadline for producing documents.

1

## <u>INSTRUCTIONS</u>

1.  These instructions and definitions apply to each of the Discovery Requests and should be construed to require answers based upon the knowledge of, and information available to, the responding party as well as its agents, representatives, and, unless privileged, attorneys.

2.  It is intended that the following Discovery Requests will not solicit any information protected either by the attorney/client privilege or work product doctrine which was created or developed by counsel for the responding party after the date on which this litigation was commenced.

3.  These Discovery Requests are continuing in character, so as to require that supplemental answers be filed if further or different information is obtained with respect to any request, and documents and tangible things sought by these requests that you obtain or discover after you serve your answers must be produced to counsel for Plaintiff by supplementary answers or productions.

4.  No part of a Discovery Request should be left unanswered merely because an objection is interposed to another part of the request. If a partial or incomplete answer is provided, the responding party shall state that the answer is partial or incomplete.

5.  With respect to document requests, requests extend to all documents in your possession, custody or control, or of anyone acting on your behalf. A document is in your possession, custody or control if it is in your physical custody or if it is in the physical custody of any other person and you:

    a.  own such document in whole or in part;

    b.  have a right, by contract, statute or otherwise, to use, inspect, examine, or copy such document on any terms;

    c.  have an understanding, express or implied, that you may use, inspect, examine or copy such document on any terms; or

    d.  have, as a practical matter, been able to use, inspect, examine, or copy such document when you sought to do so.

6.  The documents produced in response to these requests shall be (i) organized and designated to correspond to the categories in these requests, or (ii) produced as they are maintained in the normal course of business.

7.  If a document called for by these requests has been destroyed, lost, discarded, or otherwise disposed of, identify such document as completely as possible including, without limitation, the following information: author(s), recipient(s), sender(s), subject matter, date prepared or received, date of disposal, manner of disposal, reason for disposal, person(s) authorizing the disposal, person(s) having knowledge of the disposal and person(s) disposing of the document.

8. In the event that more than one copy of a document exists, produce every copy on which there appears any notation or marking of any sort not appearing on any other copy, or any copy containing attachments different from any other copy.

9. Produce all documents in their entirety, without abbreviation or redaction, including both front and back thereof and all attachments or other matters affixed thereto.

10. Pursuant to Rule 33(b)(2)(B), Rule 34(b)(2)(B), and Rule 36(a)(5), if you object to a request, the grounds for each objection must be stated with specificity. Also pursuant to Rule 33 and Rule 34, if you intended to produce copies of documents or of ESI instead of permitting inspection, you must so state.

11. Pursuant to Rule 33(b)(2)(B), Rule 34(b)(2)(C), and Rule 36(a)(5) an objection must state whether any responsive information or materials are being withheld on the basis of that objection.

12. Whenever in these requests you are asked to identify or produce a document which is deemed by you to be properly withheld from production for inspection or copying:

   a. If you are withholding the document under claim of privilege (including, but not limited to, the work product doctrine), please provide the information set forth in Fed. R. Civ. P. 26(b)(5). For electronically stored information, a privilege log (in searchable and sortable form, such as a spreadsheet, matrix, or table) generated by litigation review software, containing metadata fields that generally correspond to the above paragraph is permissible, provided that it also discloses whether transmitting, attached or subsidiary ("parent-child") documents exist and whether those documents have been produced or withheld.

   b. If you are withholding the document for any reason other than an objection that it is beyond the scope of discovery, identify as to each document and, in addition to the information requested in paragraph 4.A, above, please state the reason for withholding the document. If you are withholding production on the basis that ESI is not reasonably accessible because of undue burden or cost.

13. When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

14. In accordance with Fed. R. Civ. P. 26(b)(5), where a claim of privilege is asserted in objecting to any interrogatory or request for admission or part thereof, and information is not provided on the basis of such assertion:

    a. In asserting the privilege, the responding party shall, in the objection to the interrogatory or request for admission, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed.

    b. The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information:

        i. For oral communications:

            1. the name of the person making the communication and the names of persons present while the communication was made, and, where not apparent, the relationship of the persons present to the person making the communication;

            2. the date and place of the communication; and

            3. the general subject matter of the communication.

        ii. For documents:

            1. the type of document,

            2. the general subject matter of the document,

            3. the date of the document, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document and, where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

15. If, in answering these Discovery Requests, the responding party encounters any ambiguities when construing a question, instruction, or definition, the responding party's answer shall set forth the matter deemed ambiguous and the construction used in answering.

16. Nothing in these Discovery Requests should be construed to apply to the President of the United States or direct communications with the President.

## **<u>DEFINITIONS</u>**

Notwithstanding any definition below, each word, term, or phrase used in these Discovery Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

1. *DOGE*: The term "DOGE" refers collectively to (1) Defendant United States DOGE Service, established by Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" on January 20, 2025; (3) the U.S. DOGE Service Temporary Organization ("DOGE Temporary Organization") described in Executive Order 14158; and (3) any agent, unit, or component of the foregoing.

2. *Administrator:* The term "Administrator" means any person appointed to be the Administrator of the United States DOGE Service as established in Executive Order 14158, including any person appointed to that position on a temporary, interim, or acting basis.

3. *Federal agency*: The term "federal agency" refers to any entity of the United States government, whether executive, legislative, or judicial.

4. *Communication:* The term "communication" means the transmittal of information by any means.

5. *Document:* The terms "document" and "documents" are synonymous in meaning and equal in scope to the term "items" in Fed. R. Civ. P. 34(a)(1) and include, but are not limited to, electronically stored information. The terms "writings," "recordings," and "photographs" are defined to be synonymous in meaning and equal in scope to the usage of those terms in Fed. R. Evid. 1001. A draft or non-identical copy is a separate document within the meaning of the term "document." *However*, for purposes of these requests only, while the term "document" includes electronically stored information, it does not, unless the specific request indicates otherwise, include emails, text messages, or any similar electronically exchanged communication, except that documents should not be excluded from your response merely because they may be otherwise attached to such communications.

6. *DOGE Team*: The term "DOGE Team" is synonymous in meaning and equal in scope to the term "DOGE Team" in Executive Order 14158.

7. *Employee*: The term "employee" means any person who is authorized to perform or actually performs work on behalf of any entity or agency–including, for the avoidance of doubt, DOGE–regardless of their formal employment classification, whether they are a detailee from another agency, or are providing services on a volunteer basis. The term includes any employee who is detailed or employed elsewhere, so long as that employee continues in any role in the agency in which they are an employee. The term also includes the actual or de facto leader of an entity or agency (e.g., the DOGE Administrator is an "employee" of DOGE).

8. *Federal record:* The term "federal record" is synonymous in meaning and equal in scope to the term "record" in 44 U.S.C. § 3301.

9. *Identify (with respect to persons)*: When referring to a person, to "identify" means to state the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment. If telephone numbers are known to the answering party, and if the person is not a party or present employee of a party, said telephone numbers shall be provided. Once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that person.

10. *Identify (with respect to documents):* When referring to documents, to "identify" means to state the: (i) type of document; (ii) general subject matter; (iii) date of the document;

and, (iv) author(s), addressee(s), and recipient(s) or, alternatively, to produce the document.

11. *Location*: The term "location" means, for electronic documents and communications, the device, server, or medium on which those documents and communications are stored or maintained, as well as where any such device, server, or medium can be found. For documents in non-electronic form, the term "location" means where and in whose possession the documents can be found.

12. *Person*: The term "person" means any natural person or any business, legal or governmental entity or association, or their agents. Requests seeking the identification of a "person" seek the person's name.

13. *Relating to:* The term "relating to" means concerning, referring to, describing, evidencing, or constituting.

14. *You/Your:* The terms "You" or "Your" include the person(s) to whom these requests are addressed, and all of that person's agents, representatives, and attorneys.

15. The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all;" "any" means "any and all."  "Including" means "including but not limited to."  "And" and "or" encompass both "and" and "or."  Words in the masculine, feminine, or neuter form include each of the other genders.

16. If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

**PLAINTIFF'S FIRST SET OF INTERROGATORIES**
**TO DEFENDANTS U.S. DOGE SERVICE AND ADMINISTRATOR OF THE U.S. DOGE**
**SERVICE**

**INTERROGATORY NO. 1:** Identify all current and former employees of DOGE and members of DOGE Teams and, for each such person, the dates of their employment, their positions, whether they are paid, to whom they directly report, whether they are employed by DOGE, the DOGE Temporary Organization, or a federal agency, under whose authority they were hired or their volunteer services accepted, and whether they have independent access to DOGE office space in the Eisenhower Executive Office Building.

**RESPONSE:**


**INTERROGATORY NO. 2:** Identify any current or former employees of DOGE who have been detailed to other federal agencies or have simultaneously been employees of DOGE and a federal agency, and, for each such employee, the agencies to which they have been detailed or by which they have simultaneously been employed, their positions and duties at those agencies, and any duties they have retained at DOGE during their detail or simultaneous employment.

**RESPONSE:**


**INTERROGATORY NO. 3:** Identify each Administrator since January 20, 2025, the dates during which each person held that position, whether they interviewed for that position, with whom they interviewed, and who first informed them that they had been appointed to that position.

**RESPONSE:**


**INTERROGATORY NO. 4:** Identify all persons who oversee, supervise, or exercise authority over the conduct of DOGE employees, DOGE Teams, or any affiliates thereof, and how they do so, including any dedicated staff or systems to facilitate such oversight, any recurring reports that DOGE employees and DOGE Team members are required to submit, and any DOGE employees who are exempt from those systems or reports. As part of this response, identify all persons who have the authority to hire, terminate, or detail DOGE employees, or who have actually taken such actions, since January 20, 2025.

**RESPONSE:**

**INTERROGATORY NO. 5:** Identify each federal agency contract, grant, lease, or similar instrument that any DOGE employee or DOGE Team member directed federal agencies to cancel or rescind since January 20, 2025.

**RESPONSE:**


**INTERROGATORY NO. 6:** Identify each federal agency contract, grant, lease, or similar instrument that any DOGE employee or DOGE Team member recommended that federal agencies cancel or rescind since January 20, 2025, and whether that recommendation was followed.

**RESPONSE:**


**INTERROGATORY NO. 7:** Identify each federal agency employee or position that any DOGE employee or DOGE Team member directed federal agencies to terminate or place on administrative leave since January 20, 2025.

**RESPONSE:**


**INTERROGATORY NO. 8:** Identify each federal agency employee or position that any DOGE employee or DOGE Team member recommended federal agencies terminate or place on administrative leave since January 20, 2025 and whether that recommendation was followed.

**RESPONSE:**


**INTERROGATORY NO. 9:** Identify each federal agency database or data management system to which, since January 20, 2025, any DOGE employee has attempted to gain, has planned to gain, or plans to gain access, and whether access was obtained.

**RESPONSE:**

**INTERROGATORY NO. 10:** Describe all instances in which any DOGE employee told an employee of a federal agency that the DOGE employee would or could call law enforcement in response to the other employee's conduct, including who made such statement, the federal agency and conduct of the federal agency employee at issue, the law enforcement entity referenced, and, if the law enforcement was called, who made the call and law enforcement's response.

**RESPONSE:**

**INTERROGATORY NO. 11:** Identify whether any DOGE employee or DOGE Team member has used or presently uses non-official messaging systems or applications with auto-delete functionality, including but not limited to Signal, to conduct government business.

**RESPONSE:**

**INTERROGATORY NO. 12:** Identify all persons who are or who have posted or authored posts to the @DOGE X account since January 20, 2025.

**RESPONSE:**

**INTERROGATORY NO. 13:** For each Request for Admission served concurrently with these interrogatories, explain the basis for Defendants' response, including the basis of any partial or full denial, for any request not fully admitted.

**RESPONSE:**

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSION
## TO DEFENDANTS U.S. DOGE SERVICE AND ADMINISTRATOR OF THE U.S. DOGE SERVICE

**REQUEST FOR ADMISSION NO. 1:** Admit that since January 20, 2025, DOGE employees have directed federal agencies to cancel contracts, grants, or leases.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 2:** Admit that since January 20, 2025, DOGE employees have recommended that federal agencies cancel contracts, grants, or leases.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 3:** Admit that since January 20, 2025, DOGE Team members have directed federal agencies to cancel contracts, grants, or leases.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 4:** Admit that since January 20, 2025, DOGE Team members have recommended that federal agencies cancel contracts, grants, or leases.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 5:** Admit that since January 20, 2025, DOGE employees have directed changes in the employment status of employees of federal agencies.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 6:** Admit that since January 20, 2025, DOGE employees have recommended changes in the employment status of employees of federal agencies.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 7:** Admit that since January 20, 2025, DOGE Team members have directed changes in the employment status of employees of federal agencies.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 8:** Admit that since January 20, 2025, DOGE Team members have recommended changes in the employment status of employees of federal agencies.

Admit: _____          Deny: _____

**REQUEST FOR ADMISSION NO. 9:** Admit that since January 20, 2025, DOGE Team members have directed federal agencies to keep open vacancies in career positions.

Admit: _____          Deny: _____

**<u>REQUEST FOR ADMISSION NO. 10:</u>** Admit that since January 20, 2025, DOGE Team members have recommended that federal agencies keep open vacancies in career positions.

Admit: _____        Deny: _____

**<u>REQUEST FOR ADMISSION NO. 11:</u>** Admit that since January 20, 2025, the Office of Management and Budget has apportioned over $41 million to the "United States DOGE Service" account.

Admit: _____        Deny: _____

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANTS U.S. DOGE SERVICE AND ADMINISTRATOR OF THE U.S. DOGE SERVICE

**REQUEST NO. 1:** All Interagency Agreements or Memoranda of Understanding, from January 20, 2025 to the present, between DOGE and federal agencies.

**REQUEST NO. 2:** All Visitor Access Requests, from January 20, 2025 to the present, concerning any DOGE employee detailed to, otherwise working at, or accessing the offices of, federal agencies.

**REQUEST NO. 3:** All general terms and conditions invoices, commonly referred to as G-invoices, concerning DOGE-related work performed from January 20, 2025 to the present.

**REQUEST NO. 4:** All timekeeping records for any DOGE employee or DOGE Team member reflecting DOGE-related work.

**REQUEST NO. 5:** All final directives, or announcements of final directives, from any DOGE employee to any DOGE Team or federal agency, including such directives or announcements made by electronic messages such as email, signal message, X direct message, or text message.

**REQUEST NO. 6:** All final directives, or announcements of final directives, from any DOGE Team to any federal agency, including such directives or announcements made by electronic messages such as email, signal message, X direct message, or text message.

**REQUEST NO. 7:** All entity-wide final directives, or announcements of final directives, sent by any current or former Administrator to any DOGE employee or DOGE Team member since January 20, 2025, including such directives or announcements made by electronic messages such as email, signal message, X direct message, or text message.

**REQUEST NO. 8:** Any documents formalizing DOGE's organization, structure, reporting lines, operational units or divisions, or authority with respect to federal agencies.

**REQUEST NO. 9:** Any mission statement, memorandum, guidance, or other final records delineating the scope of DOGE's or any DOGE Team's authorities, functions, or operations.

**REQUEST NO. 10:** All announcements to any DOGE employee or DOGE Team regarding the appointment or departure of any Administrator from January 20, 2025 to the present, including such announcements made by electronic messages such as email, signal message, X direct message, or text message.

**REQUEST NO. 11:** All documents, including responses, produced in response to Plaintiff States' First Set of Written Discovery in *New Mexico v. Musk*, No. 1:25-cv-429 (D.D.C. filed February 13, 2025), and the consolidated case *Japanese American Citizens League v. Musk*, 1:25-cv-643 (D.D.C. filed Mar. 5, 2025), including copies of Defendants' answers to all requests for production, interrogatories, and requests for admission, including objections, as well as any exhibits, attachments, logs, files, or other things produced in response to Plaintiff States' requests in that case, as well as any deposition transcripts produced.

**REQUEST NO. 12:** All documents, including responses, produced in response to Plaintiff States' First Set of Written Discovery in *AFL-CIO v. Department of Labor*, No. 1:15-cv-339 (D.D.C. filed Feb. 5, 2025), including copies of Defendants' answers to all requests for production, interrogatories, and requests for admission, including objections, as well as any exhibits, attachments, logs, files, or other things produced in response to Plaintiffs' requests in that case, as well as any deposition transcripts produced.

**REQUEST NO. 13:** All "direct messages" sent by the @DOGE X account relaying any final directives to a federal agency from January 20, 2025 to the present.

**REQUEST NO. 14:** All documents describing DOGE's record retention and preservation policies, including those relating to the @DOGE X account.

## **DEPOSITIONS**

Plaintiff seeks the depositions of the following DOGE employees:

- Amy Gleason

- Steven Davis

Plaintiff also seeks a deposition of DOGE under Fed. R. Civ. P. 30(b)(6) on the following topics:

1. DOGE's establishment, mission, responsibilities, personnel, leadership structure, authorities, and decision-making and reporting structure (including the relationship of DOGE to DOGE Teams and DOGE employees detailed to or otherwise working at or with federal agencies and the relationship of DOGE Teams to federal agencies) between January 20, 2025 and the date of deposition.

2. The scope of DOGE's and DOGE Teams' authority with regard to federal agencies, and actions DOGE or DOGE Teams have actually undertaken with regard to federal agencies, between January 20, 2025 and the date of deposition.

3. The role and responsibilities of all DOGE employees detailed to or otherwise working at or with federal agencies, or having supervisory authority over DOGE employees detailed to or otherwise working at or with federal agencies, between January 20, 2025 and the date of deposition, including their titles at DOGE and any federal government entity; their responsibilities at federal agencies, DOGE, and any other federal government entities to which they have been detailed and/or otherwise assigned; their authority with regard to other federal agency staff; the supervision of said DOGE employees; and the policies, procedures, and protocols pertaining to their detailing to and activities at other federal agencies.

4. DOGE's budget, resources, funding, and expenditure of federal funds.

5. DOGE's recordkeeping and retention policies and practices.